873 F.2d 1437
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Elwin E. ALIFF; Lin-Elco Corporation, Plaintiffs-Appellants,
v.
JOY TECHNOLOGIES, INCORPORATED, a Delaware corporation,
Defendant-Appellee.
Elwin E. ALIFF; Lin-Elco Corporation, Plaintiffs-Appellees,
v.
JOY TECHNOLOGIES, INCORPORATED, a Delaware corporation,
Defendant-Appellant.
 Nos. 88-3912, 88-3965.
 United States Court of Appeals, Fourth Circuit.
 Argued: Dec. 5, 1988.
Decided: March 31, 1989.
 
 Gary Allen Davis (Sidney Gilreath, Gilreath & Associates, on brief), for appellants.
 Dennis Charles Sauter (W.T. Shaffer, Thomas J. Hurney, Jr., W. Scott Campbell, Jackson & Kelly, on brief), for appellee.
 Before SPROUSE and CHAPMAN, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Elwin E. Aliff and Lin-Elco Corporation ("Aliff") appeal from the judgment of the district court entered after a jury verdict in the trial of their action against Joy Manufacturing Company for fraudulent misrepresentation in conveying an industrial building that had been contaminated with polychlorinated biphenyls ("PCBs"). Aliff was awarded $250,000 in compensatory damages but appeals the district court's judgment denying him a new trial on his contention that the damages were inadequate. Aliff also complains that the district court erred in excluding evidence of loss of income, in excluding certain documentary evidence, and in instructing the jury that it could consider whether Joy's efforts in removing the contamination mitigated or minimized the damages. Joy, in its cross-appeal, does not contest its liability or damages but appeals from the district court's ruling refusing to impose sanctions under rule 11 of the Federal Rules of Civil Procedure and granting only a portion of the requested sanctions under rule 37. We affirm the district court's judgment in its entirety.
 
 
 2
 In April 1980 Aliff purchased the building involved in this controversy from Joy. Joy had conducted a business of repairing and rebuilding mine machinery motors, some of which were filled with fluids containing PCBs, from 1968 to 1980. During 1977 and 1978, Joy constructed and moved into a new facility in a nearby community where it serviced only motors which did not contain PCBs but continued to service motors containing PCBs and to store PCBs at the old facility. In late 1979 it listed the building for sale for the price of $485,000. Aliff contracted to purchase it from Joy for $235,000--$213,500 for land and improvements and $21,500 for fixtures and equipment. The initial contract was executed on January 4, 1980, and the sale was completed in April 1980.
 
 
 3
 After paying $235,000 for the building and its contents, Aliff immediately placed it on the real estate market for resale, asking $780,000. He received no response to his efforts to sell it. Despite his inability to sell the property, Aliff at trial was able to present the testimony of two real estate appraisers who testified variously that in 1980 the value of property was, if uncontaminated, $2,136,780 and $550,000. Joy's witness testified that it was worth $300,000 in 1980.[1]
 
 
 4
 During the time Joy used the building, fluid containing PCBs, a probable carcinogen, was commonly used in the motors serviced by Joy as a lubricant, insulator, and coolant. The Environmental Protection Agency ("EPA"), which regulates PCBs use and storage under the Toxic Substances Control Act of 1976, 15 U.S.C.A. Sec. 2605(e) (West 1982), first inspected the building for compliance with its PCBs regulations in 1979, after Joy had moved the bulk of its operations to its new building. It is uncontradicted that Joy followed the EPA's then applicable procedures for cleaning the building before it sold it to Aliff. Aliff discovered in early 1984, however, that the building was still contaminated when he had it tested after news reports highlighted the dangers of PCBs.
 
 
 5
 This action was initiated in late 1984; in 1986, the EPA ordered Joy to perform a clean-up which met current standards. Joy retained a company to clean up the site under the supervision of the EPA and expended approximately five million dollars in that enterprise, cleaning the equipment and interior of the building, excavating contaminated soil, and landscaping the area. Evidence at trial indicated that the property was rehabilitated, but there was no evidence as to its market value after its rehabilitation.
 
 
 6
 At Aliff's request, the jury was instructed that it could calculate damages based on the difference between the market value of the property in 1980 assuming its condition was as Joy had represented and its actual value at the time of the sale. The jury was also instructed that it could find for Aliff if Joy either had knowledge of the PCBs contamination and failed to disclose it to Aliff or that Joy affirmatively misled Aliff about the PCBs contamination. With these instructions, the jury returned a verdict in favor of Aliff and fixed damages at $250,000. Aliff, in contending that the award is inadequate and unsupported by the evidence, argues that the jury ignored evidence relating to the building's value in 1980--that is, evidence that the building was considerably more valuable than the sum he paid for it.
 
 
 7
 In his complaint, Aliff also sought damages for loss of income from two of his businesses, Aliff Construction Company and Lin-Elco Corporation. Prior to 1980, Aliff was the sole stockholder and chief operator of the Aliff Construction Company, which conducted a construction and land development business in Bluefield, West Virginia. Aliff Construction Company, however, ceased doing business some months after Aliff contracted to buy the Joy building in 1980 and was finally liquidated in 1981. After Aliff purchased the building, he and Lindon Taylor organized the Lin-Elco Corporation in 1981 and for a short while that corporation operated a motor repair and service business in the building. Taylor left the Lin-Elco Corporation in 1982, a year after it was organized, and the corporation ceased doing business in 1983.
 
 
 8
 In this circuit, we are committed to the view that the decision to set aside an excessive verdict and grant a new trial pursuant to rule 59 is a matter of federal law. Johnson v. Parrish, 827 F.2d 988, 991 (4th Cir.1987). That same rule, of course, applies to decisions concerning the setting aside of an inadequate verdict.
 
 
 9
 In federal courts, "the clearly discretionary act embodied in granting a new trial is reviewable only in the 'most exceptional circumstances.' " Id. (quoting Aetna Casualty & Surety Co. v. Yeatts, 122 F.2d 350, 354 (4th Cir.1941)). Our authority to overrule the district court's exercise of discretion in denying a new trial on the basis of excessive damages is limited to those instances in which, after "a detailed appraisal of the evidence, giving the benefit of every doubt to the judgment of the trial judge, ... [this court finds] the award to be 'grossly excessive, inordinate, shocking to the judicial conscience ... [or] monstrous.' " Klein v. Sears Roebuck & Co., 773 F.2d 1421, 1428 n. 6 (4th Cir.1985) (quoting Grunenthal v. Long Island Railroad Co., 393 U.S. 156, 159 and n. 4 (1968)). The same standard guides our consideration of a trial court's denial of a motion for a new trial based on a contention that the verdict is inadequate. Black v. Hieb's Enterprises, 805 F.2d 360, 362 (10th Cir.1986); Iowa-Mo Enterprises v. Avren, 639 F.2d 443, 452 (8th Cir.1981); Ohanian v. Avis Rent A Car System, 779 F.2d 101, 110 (2d Cir.1985); Yodice v. Koninklijke Nederlandsche Stoomboot Maatschappij, 471 F.2d 705 (2d Cir.1972), cert. denied, 411 U.S. 933 (1973).
 
 
 10
 Admittedly, the testimony of real estate appraisers in this case indicated a possible 1980 value for the property ranging from $300,000 to approximately two million dollars. The jury, however, was apparently persuaded by the objective evidence of the price that Aliff paid for the property. The persuasiveness of that evidence was enhanced by the failure of Joy to obtain a higher price before the sale and a similar failure by Aliff after he purchased it. That evidence was that Joy sold the real property to Aliff for $213,500 after attempting to sell it for $485,000. Aliff thereafter was unable to get even a nibble at his offer to sell at a higher price. Neither Aliff nor Joy presented any evidence concerning the market value of the real and personal property after it was decontaminated. Against this evidentiary background, the jury award of $250,000 cannot be considered so inadequate as to require reversal under the strict standards governing our review.[2]
 
 
 11
 Aliff's second argument is that the judgment should be reversed because the district court excluded evidence for the loss of income he suffered by his inability to operate Aliff Construction Company. Aliff concedes, however, that he ceased doing business as a construction company soon after he purchased the building and that he made no efforts to carry on that business between that time and the time he discovered the contamination in late 1983. He argues only that he once had a successful construction business and that he had the ability and intent to re-enter the construction business until the loss of equipment and capital resulting from the contamination of the property prevented it--hardly an evidentiary basis for showing loss of future income. Similarly, no matter how culpable Joy might have been either in contaminating the building or in failing to disclose the contamination when it sold it, the economic misfortunes of the Lin-Elco Corporation could not be found under any appropriate interpretation of the evidence to have been caused by Joy's conduct. Lin-Elco ceased doing business at about the time Aliff discovered the contamination, but it is clear that its failure was not related to the PCBs contamination.
 
 
 12
 Aliff next contends that the district court erred in giving the jury the following instruction:
 
 
 13
 If the plaintiff proves that he is entitled to recover damages from Joy, in awarding plaintiff damages, if any, you may take into account activities undertaken by Joy subsequent to the sale of the building which may have mitigated or minimized the plaintiff's alleged damages.
 
 
 14
 If you find that Joy's cleanup activities have reduced the plaintiff's damages, then you may reduce the plaintiff's damages accordingly.
 
 
 15
 Aliff correctly represents that there was no evidence of either the value of the real estate or personal property after the clean-up effort. There was, however, evidence that the property was rehabilitated. The instruction, baldly stated, gives us concern, but we are not prepared to say that instructing the jury in this fashion amounted to reversible error.
 
 
 16
 Finally, with regard to the last point raised by Aliff on appeal, we disagree with his contention that the district court erred in not allowing Aliff's expert to refer on the witness stand to a document drafted by one of Joy's non-testifying experts. Joy's experts had previously been the subject of a protective order under rule 26(b)(4)(B) of the Federal Rules of Civil Procedure, but, for some reason, Joy furnished the report to Aliff during discovery. The district court, however, held that, consistent with its protective order, the report could not be referred to by Aliff's expert. Quite apart from the rule 26(b)(4)(B) question, rule 703 of the Federal Rules of Evidence, in our view, does not provide authority for introduction of one party's non-testifying expert's opinion through the testimony of the other party's expert.
 
 
 17
 Turning to Joy's cross-appeal of the district court's decision refusing to grant rule 11 sanctions and to grant only partial sanctions under rule 37 against Aliff for the pursuit of claims on which he did not prevail, we affirm the district court's judgment. Aliff initially demanded damages for the loss of his home and "development" property in Virginia. Joy argues that little or no evidence supports those counts of the complaint and that their inclusion in it and their pursuit through pretrial discovery were so frivolous as to require a trial court on motion to impose sanctions.
 
 
 18
 The district court, in ruling on Joy's motion, stated,
 
 
 19
 It appears to the Court that it cannot be said that counsel for the Plaintiff acted in a way that was not reasonable under the circumstances. This action involved complex litigation wherein it was not always clear as to what damages the Plaintiff might or might not be entitled to recover. Under the circumstances the Plaintiff's counsel is required to be a zealous advocate and at the same time only pursue damages in good faith.
 
 
 20
 The court concluded, in effect, that the litigation choices presented to Aliff's counsel were difficult ones and not so frivolous as to require the imposition of rule 11 sanctions. The district court also concluded that, aside from certain expenses which Aliff did not dispute, Joy's request for rule 37 discovery expenses should also be denied because Aliff "may have had a good faith belief that the Court would allow him to present the evidence the Court ultimately found to be too speculative for presentation to the jury."
 
 
 21
 The district court considered numerous aspects of these counts of the complaint both during pre-trial and trial and ruled in detail on many of trial counsels' motions concerning the issues underlying those theories which Aliff advanced as grounds for recovery. We are not prepared to say that the district court, with its detailed knowledge of the progress and contours of this litigation, abused its discretion in denying Joy's motion. See Fahrenz v. Meadow Farm Partnership, 850 F.2d 207, 210-11 (4th Cir.1988) (district court has discretion in awarding rule 11 sanctions); National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639, 642 (1976); Basch v. Westinghouse Electric Corp., 777 F.2d 165, 174 (4th Cir.1985), cert. denied, 476 U.S. 1108 (1986) (district court has discretion in awarding rule 37 sanctions).
 
 
 22
 In view of the above, the judgment of the district court is affirmed.
 
 
 23
 AFFIRMED.
 
 
 
 [1]
 Aliff and Joy also presented evidence concerning the value of personal property located in the building
 
 
 [2]
 We decide this issue under federal law. We note, however, that we would reach the same result if West Virginia law applied. A West Virginia court will not set aside a jury verdict "unless it is not supported by evidence or ... the amount ... indicates that the jury was influenced by passion, partiality, prejudice or corruption, or entertained a mistaken view of the case." Elsey Ford Sales, Inc. v. Solomon, 280 S.E.2d 718, 721 (W.Va.1981) (quoting Earl T. Browder, Inc. v. County Court, 116 S.E.2d 867, 869 (W.Va.1960)). Given the evidence presented to the jury in this case, we do not agree with Aliff that the verdict is one which "does not include as elements of damages all the items ... the amount of which is definite and certain, are not controverted, and constitute a special pecuniary loss by the plaintiff ... and award[s] the plaintiff damages in an amount materially less than that to which the plaintiff is justly entitled, as shown by the evidence, [and is therefore] wholly inadequate in amount." Hall v. Groves, 153 S.E.2d 165, 172 (W.Va.1967)